WILENTZ, GOLDMAN & SPITZER
A Professional Corporation
110 William Street
26th Floor
New York, NY 10038-3901
(212) 267-3091
Attorneys for Defendants
 D&S Consultants, Inc., and
 Steven DeChiaro

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------X
                          :

Thomas DeChiaro,          :    Civil Action No. 08 CIV 1199

       Plaintiff,      :    (BRIEANT)

vs.               :    **DEFENDANTS' NOTICE**

D&S Consultants, Inc., and Steven   :    **OF MOTION TO**
DeChiaro,           :    **DISMISS PLAINTIFF'S**
                :    **COMPLAINT AND**
       Defendants.    :    **COMPEL**
                :    **ARBITRATION**
                :
                :
-----------------------------------------------X

TO:   Leonard Benowich, Esq.
      Benowich Law, LLP
      1025 Westchester Avenue
      White Plains, New York 10604
      Attorneys for Plaintiff

COUNSEL:

**PLEASE TAKE NOTICE** that on March 28, 2008, at 10:00 a.m., or as soon thereafter as counsel may be heard, the undersigned, attorneys for defendants D&S Consultants, Inc. ("DSCI") and Steven DeChiaro ("Steven") (collectively, "Defendants") shall move before the Honorable Charles L. Brieant, U.S.D.J., at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, for an Order dismissing plaintiff Thomas DeChiaro's ("Plaintiff") Complaint with prejudice and compelling arbitration.

**PLEASE TAKE FURTHER NOTICE** that in support of this motion, Defendants rely upon its Memorandum of Law in Support of their Motion to Dismiss and Compel Arbitration, and the Certification of Willard C. Shih, dated February 26, 2008.

**PLEASE TAKE FURTHER NOTICE** that Defendants hereby request oral argument on the instant application, and a form of Order is submitted herewith.

WILENTZ, GOLDMAN & SPITZER, P.A
Attorneys for Defendants

By:___/s/_____
        WILLARD C. SHIH

Dated: February 26, 2008

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X

| | |
|---|---|
| THOMAS DECHIARO, | : |
|      Plaintiff, | : |
| vs. | : |
| D&S CONSULTANTS, and STEVEN DECHIARO, | : |
|      Defendants. | : |

Civil Action No. 08 CIV 1199
(BRIEANT)

-------------------------------------------------X

========================================================

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AND COMPEL ARBITRATION

========================================================

WILENTZ, GOLDMAN & SPITZER
A Professional Corporation
110 William Street
26th Floor
New York, NY 10038-3901
(212) 267-3091
Attorneys for Defendants
D&S Consultants, Inc., and Steven
DeChiaro

WILLARD C. SHIH, ESQ.
  Of Counsel and On the Brief

DONALD E. TAYLOR, ESQ.
ROBERT L. SELVERS, ESQ.
  On the Brief

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF FACTS ................................................................. 2

LEGAL ARGUMENT ....................................................................... 6

POINT I............................................................................................ 6

    PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED,
    AS THE COURT SHOULD ENFORCE THE
    ARBITRATION PROVISION SET FORTH IN THE
    AGREEMENT AND COMPEL ARBITRATION .................................. 6

POINT II ......................................................................................... 10

    IN THE EVENT PLAINTIFF'S COMPLAINT IS NOT
    DISMISSED, THIS ACTION SHOULD BE STAYED
    PENDING THE ARBITRATION ........................................................ 10

CONCLUSION ................................................................................ 12

# TABLE OF AUTHORITIES

**Page**

## CASES

Dean Witter Reynolds, Inc. v. Byrd,
    470 U.S. 213 (1985) .................................................................................. 12

Genesco, Inc. v. T. Kakiuchi & Co.,
    815 F.2d 840 (2d Cir. 1987) ...................................................................... 7

Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.,
    246 F.3d 219 (2d Cir. 2001) ...................................................................... 7

NPS Communications, Inc. v. Continental Group, Inc.,
    760 F.2d 463 (2d Cir. 1985) ...................................................................... 13

Oldroyd v. Elmira Savings Bank, FSB,
    134 F.3d 72 (2d Cir. 1998) ........................................................................ 9

Rubin v. Sona Int'l Corp.,
    457 F.Supp. 2d 191 (S.D.N.Y. 2006) ........................................................ 7

Tarulli v. Circuit City Stores, Inc.,
    333 F.Supp. 2d 151 (S.D.N.Y. 2004) ........................................................ 6

## STATUTES

9 U.S.C. § 2 ............................................................................................... 7

9 U.S.C. § 3 ...................................................................................... 10, 12

## **PRELIMINARY STATEMENT**

Defendants D&S Consultants, Inc. ("DSCI") and Steven DeChiaro ("Mr. DeChiaro") (together, "Defendants") submit this Memorandum of Law, along with the Certification of Willard Shih, dated February 28, 2008 ("Shih Cert."), in support of their Motion to Dismiss plaintiff Thomas DeChiaro's ("Plaintiff") Complaint and Compel Arbitration.

Plaintiff was employed by DSCI as Group President with responsibility for business development under an employment agreement (the "Agreement"). The Agreement contains a broad arbitration provision that "any dispute or controversy arising with respect to" Plaintiff's employment with DSCI shall be arbitrated. Plaintiff's claims in this case are for breach of the Agreement (Counts III and IV), and for breach of a supposed side agreement for a "finders fee" for business development (Counts I and II). Thus, all issues in this case arise out of and are related to Plaintiff's employment with DSCI as Group President charged with business development under the Agreement. Therefore, pursuant to the arbitration provision in the Agreement, these claims must be submitted to arbitration.

Moreover, because the Agreement expressly states that the arbitration must take place in New Jersey under applicable New Jersey law, and that the parties consented to the New Jersey courts rendering judgment on any arbitration award, dismissal of the pending case is appropriate.

-1-

If Plaintiff's Complaint is not dismissed while the dispute is arbitrated, the action should be stayed, as all of the issues raised by Plaintiff fall within the broad arbitration provision. Therefore, upon referral to arbitration, no claims would remain for this Court to adjudicate until the arbitration has been completed.

## STATEMENT OF FACTS

**A.    Plaintiff's Employment.**

    **1.    Plaintiff's Employment Agreement.**

On or about October 8, 2005, Plaintiff entered into a three-year employment agreement with DSCI. See (Plaintiff's Complaint, ¶¶ 17-18); see also (Shih Cert, Exh. A, ¶ 1.1). Plaintiff was hired as DSCI's President of Commercial Products Group, responsible for Commercial Business Development, and Plaintiff agreed to devote his full working time and attention to DSCI's business, and to the development of DSCI's business. See (Plaintiff's Complaint, ¶ 19); see also (Shih Cert., Exh. A, ¶¶ 2.1, 2.2(b)). Thus, Plaintiff's duties under the terms of the Agreement involved "finding" and securing business opportunities for DSCI. Id.

Pursuant to the Agreement, upon notice, Plaintiff's employment with DSCI could be terminated by either party for cause, or by DSCI without cause. See (Shih Cert., Exh. A, ¶¶ 4.1-4.2). In the event that a dispute arose pertaining to Plaintiff's employment, ¶ 13.8 of the Agreement (the "Arbitration Provision") entitles Plaintiff or Defendant to have such disputes addressed through arbitration:

> ... any dispute or controversy arising with respect to this
> Agreement and [Plaintiff's] employment hereunder
> (whether based on contract or tort or upon any federal,
> state or local statue ...) shall, at the election of either
> [Plaintiff or DSCI], be submitted to JAMS/ENDISPUTE,
> or similar entity for resolution in arbitration in
> accordance with the rules and procedures of
> JAMS/ENDISPUTE, or similar entity.

(Shih Cert, Exh. A, ¶ 13.8). Upon electing arbitration, the Arbitration Provision requires that "[a]ny such [arbitration] proceedings ... take place in New Jersey", and that "the parties consent to the jurisdiction of the New Jersey courts" for entry of any arbitration award. (Shih Cert, Exh. A, ¶ 13.8). Finally, the Agreement provides that the "substantive laws of the State of New Jersey" are to be controlling. (Shih Cert., Exh. A, ¶ 13.1).

## 2.    **Plaintiff's Alleged Business Development Agreement.**

Plaintiff claims that he entered into a separate verbal agreement with either Mr. DeChiaro and/or DSCI on some unspecified date, whereby Plaintiff alleged that "[Mr.] DeChiaro and/or DSCI would pay Plaintiff a finder's fee for all investor capital he succeeded in bringing to DSCI" (the "Business Development Agreement"). (Plaintiff's Complaint, ¶ 10). The purpose of the supposed oral Business Development Agreement, as Plaintiff alleges, was for Plaintiff to "rais[e] investor capital" in order to aide "**the development of DSCI's business**." (Plaintiff's Complaint, ¶ 9) (emphasis added).

While Plaintiff alleges the existence of this supposed oral Business Development Agreement, the Agreement expressly states that it embodied "the entire agreement and understanding of the parties relating to the subject matter of th[e] Agreement and supersedes all prior agreements, arrangements and understandings, written or oral, between the parties." (Shih Cert., Exh. A, ¶ 13.3). The Agreement further states that "no representation, promise or inducement has been made by either party that is not embodied in th[e] Agreement, and neither party shall be bound by or liable for any alleged representation promise or inducement not so set forth." (Shih Cert., Exh. A, ¶ 13.4). Thus, all of Plaintiff's supposed rights as an employee of DSCI specifically charged with business development, i.e., finding and securing business opportunities, is defined exclusively by the Agreement.

**B.**    **The Termination Of Plaintiff's Employment.**

Plaintiff alleges that by letter dated November 26, 2007 he "notified Defendants that he was terminating the Agreement due to DSCI's material breach thereof." (Plaintiff's Complaint, ¶ 26). Plaintiff further alleges that by letter dated November 29, 2007, Defendants responded by terminating the Agreement "effective immediately", for "cause", which termination Plaintiff contends violated the Agreement. (Plaintiff's Complaint, ¶ 27).

**C.**    **Plaintiff's Dispute With Defendants.**

On or about February 5, 2008, Plaintiff filed this action, essentially alleging that Defendants breached the Agreement and the related oral Business Development Agreement.  With respect to Plaintiff's claims flowing from the Agreement, Plaintiff seeks damages as a result of Defendants alleged breach of the Agreement, as well as an affirmative declaration of the Court that "Defendants' Notice terminating the Agreement is ineffective."  See (Plaintiff's Complaint, Counts III, IV).  Plaintiff's Complaint further alleges that Defendants breached the related Business Development Agreement, and that, as a result, Defendants were unjustly enriched. See (Plaintiff's Complaint, Counts I, II).

**D.**    **Defendants' Election To Arbitrate.**

In accordance with the express terms of the Arbitration Provision, by letter dated February 21, 2008, Defendants elected to have Plaintiff's dispute arbitrated. See (Shih Cert., Exh. B).  To date, Plaintiff has not acceded to Defendants' election, and has neither withdrawn his Complaint nor submitted his claims to arbitration.

**LEGAL ARGUMENT**

**POINT I**

**PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED, AS THE COURT SHOULD ENFORCE THE ARBITRATION PROVISION SET FORTH IN THE AGREEMENT AND COMPEL ARBITRATION**

The Arbitration Provision contained within the Agreement mandates that Plaintiff's dispute must be arbitrated rather than litigated. Therefore, Plaintiff's claims must be submitted to arbitration, which result is in accord with the Federal Arbitration Act ("FAA"). In addition, the Complaint should be dismissed rather than stayed because, pursuant to the Agreement, the arbitration is to be conducted in New Jersey pursuant to New Jersey law, and any subsequent action to enforce the arbitration award is to be brought in New Jersey. Accordingly, no claims shall exist for this Court to adjudicate following the arbitration, and Plaintiff's Complaint should be dismissed.

"The FAA covers arbitration provisions that are contained in employment contracts ..." Tarulli v. Circuit City Stores, Inc., 333 F.Supp. 2d 151, 155 (S.D.N.Y. 2004). "The determination of whether a dispute is arbitrable under the FAA comprises two questions: '(1) whether there exists a valid agreement to arbitrate at all under the contract in question ... and if so, (2) whether the particular dispute to be arbitrated falls within the scope of the arbitration agreement.'" Rubin v. Sona Int'l Corp., 457 F.Supp. 2d 191, 195 (S.D.N.Y. 2006) (quoting Hartford

Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001).  Pursuant to Section 2 of the FAA, the Arbitration Provision is deemed "valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Tarulli, 333 F.Supp. 2d at 155 (quoting 9 U.S.C. § 2).  In interpreting the FAA, "[t]he Second Circuit [has] found that the FAA 'leaves no place for the exercise of discretion by the district court, but instead mandates that district courts **shall** direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  Id. (quoting Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir. 1987)) (emphasis in original).

It is apparent that the disputes raised by Plaintiff are covered by the Arbitration Provision and, therefore, must be arbitrated.  Specifically, Counts III and IV of Plaintiff's Complaint directly relate to Defendants' alleged breach of the Agreement itself, and plainly fall within the Arbitration Provision, which requires that "any dispute or controversy arising with respect to the Agreement and [Plaintiff's] employment hereunder [with DSCI]" be submitted to arbitration at the election of either Plaintiff or DSCI.  (Shih Cert., Exh. A, ¶ 13.8).  Thus, given that Defendants did, in fact, elect to have Plaintiff's claims arbitrated (see Shih Cert., Exh. B), Counts III and IV of Plaintiff's Complaint should be dismissed and arbitrated.

Similarly, Counts I and II of Plaintiff's Complaint, which seek relief based on Defendants' alleged breach of the supposed oral Business Development Agreement, also "arise" out of Plaintiff's employment with DSCI, are subject to the Arbitration Provision, and should be submitted to arbitration.   Under the Agreement, Plaintiff was responsible for business development.   <u>See</u> (Shih Cert., Exh. A, ¶ 2.1).   Plaintiff now alleges that there was some side deal by which he would be paid additional monies for business development.   This side deal to develop leads for DSCI plainly overlaps and arises out of Plaintiff's responsibilities for business development that are set forth in the Agreement.   <u>See</u> (Shih Cert., Exh. A, ¶ 2.1) (Pursuant to the Agreement, Plaintiff was "responsible for [DSCI's] **Business Development**") (emphasis added); <u>compare</u> <u>with</u> (Plaintiff's Complaint, ¶ 9) (The impetus behind the side deal Business Development Agreement was for Plaintiff to raise investor capital to help in "**the development of DSCI's business**") (emphasis added).   Therefore, as Plaintiff's performance under the supposed oral Business Development Agreement "arises" out of the very responsibilities defined by the Agreement, the Arbitration Provision plainly covers Counts I and II.

Compelling arbitration of these claims is consistent with the "strong federal policy favoring arbitration as an alternative means of dispute resolution." <u>Oldroyd v. Elmira Savings Bank, FSB</u>, 134 F.3d 72, 76 (2d Cir. 1998) (citations omitted).

The Second Circuit "'construe[s] arbitration clauses as broadly as possible', resolving 'any doubts concerning the scope of arbitrable issues [is resolved] in favor of arbitration.'" Id. (citations omitted). "'[T]he existence of a broad agreement to arbitration creates a presumption of arbitrability which is only overcome if it may be said *with positive assurance that the arbitration clause is not susceptible of any interpretation that [it] covers the asserted dispute*." Id. (citations omitted) (emphasis in the original). The Arbitration Provision set forth in the Agreement constitutes the "broad agreement to arbitration" contemplated by the Second Circuit, as it directly covers "any dispute or controversy arising with respect to the Agreement and [Plaintiff's] employment hereunder [with DSCI]." (Shih Cert., Exh. A, ¶ 13.8). Therefore, the "presumption of arbitrability" attaches to the side deal claims.

Moreover, pending arbitration, Plaintiff's Complaint should be dismissed, as the Agreement mandates that the arbitration take place in New Jersey in accordance with New Jersey law, and that New Jersey courts should have jurisdiction to hear any disputes following the arbitration. In the first instance, the Arbitration Provision dictates that "[a]ny such [arbitration] proceedings … take place in New Jersey". (Shih Cert, Exh. A, ¶ 13.8). While this aspect of the Arbitration Provision alone is not dispositive, the Arbitration Provision also acknowledged the parties "consent to the jurisdiction of the New Jersey courts" for

the purpose of entering the arbitration award as a judgment. (Shih Cert, Exh. A, ¶ 13.8). Thus, when these terms of the Arbitration Provision are read in conjunction with the choice of law provision, which requires that New Jersey law apply to any dispute pertaining to the Agreement, it is apparent that New Jersey is the proper forum for Plaintiff's claims following arbitration. Therefore, the Complaint should be dismissed, rather than stayed, pending arbitration, because upon the completion of the arbitration in New Jersey pursuant to New Jersey law, jurisdiction shall be appropriate in the courts of New Jersey rather than New York.

**POINT II**

**IN THE EVENT PLAINTIFF'S COMPLAINT IS
NOT DISMISSED, THIS ACTION SHOULD BE
STAYED PENDING THE ARBITRATION**

While Plaintiff's Complaint should be dismissed, at a minimum, this action should be stayed pending arbitration. "Section 3 of the FAA provides for a stay of legal proceedings when the court is satisfied that the issue is arbitrable under an arbitration agreement." <u>Tarulli</u>, <u>supra</u>, 333 F. Suprr. 2d. at 155; <u>see</u> 9 U.S.C. § 3 ("the court … upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration … **shall** on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement") (emphasis added).

> A court asked to stay proceedings pending arbitration must resolve four issues: first, it must determine whether

-10-

the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

Oldroyd v. Elmira Savings Bank, FSB, (2d Cir. 1998) (citing Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir. 1987)).[1]  The Arbitration Provision in this case satisfies the first factor, clearly evidencing the parties' agreement to proceed to arbitration.  With respect to the second factor, as set forth above, the Arbitration Provision encompasses all of Plaintiff's claims, thereby compelling arbitration of the disputes, and rendering the fourth factor inapplicable. Indeed, Counts III and IV of Plaintiff's Complaint arise directly out of the Agreement itself, while Counts I and II of Plaintiff's Complaint "arise out of" Plaintiff's employment as Group President responsible for Business Development, all of which are covered by the broad agreement to arbitrate such claims set forth in the Arbitration Provision.  Therefore, upon referral of these claims to arbitration, Plaintiff's Complaint should be stayed.[2]

---

[1] The third factor is not applicable, as Plaintiff has not asserted any statutory claims.

[2] Although Counts III and IV of Plaintiff's Complaint are covered by the Arbitration Provision, in the event that the Court determines that Plaintiff's claims under the alleged side deal for business development are not subject to the Arbitration Provision, Counts III and IV should still be referred to Arbitration, and (cont'd. on next page...)

-11-

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss and compel arbitration should be granted. In the alternative, the matter should be stayed pending arbitration of the parties' disputes.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Defendants

By /s/ _____
    WILLARD C. SHIH
    For the Firm

Dated: February 26, 2008

---

those Counts that relate to the alleged side deal (Counts I and II) should be stayed pending arbitration. See 9 U.S.C. § 3; see also Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217 (1985) ("the [FAA] requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums."). As the Plaintiff's arbitrable claims predominate, staying the remaining Counts of Plaintiff's Complaint pending arbitration is warranted. See Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 856 (2d Cir. 1987). Moreover, the allegations in support of Plaintiff's claim that Defendants breached the supposed side deal are likely barred by the integration clauses of the Agreement, leading to the conclusion that such claims are of "questionable merit", thereby entitling Defendants to a stay of these claims pending the arbitration of Plaintiff's breach of the Agreement claims. See Id. (citing NPS Communications, Inc. v. Continental Group, Inc., 760 F.2d 463, 465 (2d Cir. 1985)).

WILENTZ, GOLDMAN & SPITZER
A Professional Corporation
110 William Street
26th Floor
New York, NY 10038-3901
(212) 267-3091
Attorneys for Defendants
  D&S Consultants, Inc., and
  Steven DeChiaro

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X
|                                          :
Thomas DeChiaro,                          :    Civil Action No. 08 CIV 1199
              Plaintiff,                  :    (BRIEANT)
                                          :
vs.                                       :
                                          :    **CERTIFICATION OF**
D&S Consultants, Inc., and Steven         :    **WILLARD C. SHIH**
DeChiaro,                                 :
                                          :
              Defendants.                 :
                                          :
                                          :
                                          :
-------------------------------------------------X

WILLARD C. SHIH, of full age, hereby certifies as follows:

1.      I am an attorney at law of the State of New York and I am a

shareholder of Wilentz, Goldman & Spitzer P.A., attorneys for the defendants

D&S Consultants, Inc. ("DSCI") and Steven DeChiaro ("Mr. DeChiaro")

(collectively, "Defendants") in the captioned matter.

2.     I make this certification in support of Defendants' Motion to Dismiss plaintiff Thomas DeChiaro's ("Plaintiff") Complaint, and compel arbitration.

3.     Attached hereto as Exhibit A is a true copy of Plaintiff's employment agreement with DSCI, dated October 8, 2005.

4.     Attached hereto as Exhibit B is a true copy of Defendants' counsel's letter to Plaintiff's counsel dated February 21, 2008.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I may be subject to punishment pursuant to 28 U.S.C. § 1746.

/s/WILLARD C. SHIH

Dated:  February 26, 2008

EXHIBIT A

FINAL VERSION 10-08-05

# EMPLOYMENT AGREEMENT

**EMPLOYMENT AGREEMENT** made October *08*, 2005, effective as of November 1, 2005 (the "Effective Date"), between D & S CONSULTANTS, INC., a New Jersey corporation (the "Company" or "DSCI"), P.O. Box 7259, Freehold, NJ 07728, and THOMAS DECHIARO ("Group President"), with an address 10 Gilead Road, Mahopac, New York 10541.

## WITNESSETH:

**WHEREAS**, Company desires to employ the Group President on the terms and conditions hereinafter set forth; and

**WHEREAS**, the Group President desires to be so employed;

**NOW, THEREFORE**, the parties, in consideration of Ten and 00/100 ($10.00) Dollars and other good and valuable consideration, each to the other in hand paid, receipt of which is hereby acknowledge hereby agree as follows:

1. **Term of Employment.**

    1.1 **Term. Group President's** "term of employment" as this phrase is used throughout this Agreement, shall be for the period beginning on the Effective Date and ending on October 31, 2008 (the "Term Date"), subject, however, to earlier termination as set forth in this Agreement. Group President shall have the right to renew this Employment Agreement for an additional two (2) year term upon written notice to Company on or before August 1, 2008.

2. **Employment.**

    2.1 During the period of Group President's employment by Company during the term hereof, Group President shall (a) serve as the Company's President of Commercial Products Group, (b) shall be principally responsible for the Company's Commercial Business Development, and (c) shall report to the Company's Chief Executive Officer. Notwithstanding the preceding sentence, the Company may change Group President's title and/or responsibilities from time to time; provided that the Company may not (a) diminish Group President's title, (b) diminish Group President's authority (when viewed in the aggregate), or (c) cause Group President to report to anyone other the Company's Chief Executive Officer.

    2.2 Group President shall, during the course of his employment by the Company during the term hereof:

1

(a) attempt in good faith to do and perform all such acts and duties and furnish such services, all as commensurate with his position, as the Company shall reasonably request, reasonably cooperate with the Company, and attempt in good faith to do and perform all acts in the ordinary course of the Company's business reasonably necessary and conducive to the performance of his duties hereunder; and

(b) devote his full time, energy and skill to the business of the Company and to the promotion of the Company's best interests, except for vacations and absences made necessary because of illness or other traditionally approved leave purposes. Group President shall not be prevented from managing his and his family's personal investments, being involved in personal business ventures that are not in direct competition with Company, being involved in charitable, civic and professional activities (including serving on the boards of directors of not-for-profit organizations) and serving on the boards of directors of for-profit entities so long as such activities do not materially interfere with Group President's performance of his duties hereunder.

2.3 During the term of employment, Group President shall serve as President of the Company's Commercial Products Group and Group President shall have the authority, functions, duties, powers and responsibilities normally associated with such position and such additional authority, functions, duties, powers and responsibilities as may be assigned to Group President from time to time by the Company consistent with Group President's senior position with the Company. During the term of employment, (i) Group President's services shall be rendered on a full-time, exclusive basis and Group President will apply on a full-time basis all of his skill and experience to the performance of his duties, (ii) Group President shall report to the Chief Executive Officer of the Company and (iii) the place for the performance of Group President's services shall be located in the vicinity of the Mahopac, New York area and, as may be required from time to time, approximately one (1) week per month, be available at the Company's Corporate Headquarters, currently located in Eatontown, New Jersey, subject to such reasonable travel as may be required in the performance of Group President's duties, which travel shall also be approximately one (1) week per month.

3. **Compensation and Benefits.**

3.1 **Base Salary**. Group President's base salary for the course of his employment by the Company during the term hereof shall be no less than One Hundred Fifty-Six Thousand and 00/100 ($156,000.00) Dollars per year (paid monthly at $13,000.00 every month pro rated for any period of service less than a full year). Group President's base salary shall not be increased for the remainder

of 2005, but such salary shall be subject to increases in accordance with the Company's normal salary review process for 2006 and any subsequent year during the course of his employment by the Company during the term hereof.

3.2    **Bonus**.  Commencing on January 1, 2006 and for the balance of the period of Group President's employment by the Company during the term hereof Group President shall be eligible for all Company Bonus Plans in accordance with Company's policies.

3.3    **Company Stock.**  Upon execution of this Agreement by Group President and Company, Company agrees to issue an equivalent of one hundred (100) shares of the Company's capital stock which will vest at 33 1/3rd% per year, with the first thirty-three and one-third (33 1/3rd%) percent vesting immediately as of the Effective Date and each remaining 33 1/3rd% vesting on the first and second anniversary of the Effective Date.

3.4    **Employment Transition Cost.**   Group President shall also receive an additional Thirty Thousand and 00/100 ($30,000.00) Dollars relating to transition costs relating to employment of Group President by Company which shall be paid in accordance with the following schedule: (1) Six Thousand and 00/100 ($6,000.00) Dollars payable within 15 days of execution of this Agreement and (2) Two Thousand and 00/100 ($2,000.00) Dollars payable in monthly installments beginning on December 15, 2005 and ending on November 15, 2006.

3.5    **Pension and Retirement Plans.**   Group President shall be eligible for participation in the Company's 401K Retirement Plan as per the plan's rules and Group President shall be eligible for any other retirement or pension plans the Company offers or that may come into existence.

3.6    **Benefits**.   Group President shall be entitled to all benefits (Appendix A) offered to all employees of the Company understanding that benefits are subject to change.

4.    **Termination.**

4.1    **Termination for Cause**. The Company may terminate the term of employment and all of the Company's obligations under this Agreement, other than its obligations set forth below in this Section 4.1, for "cause". Termination by the Company for "cause" shall mean termination by action of the Company because of (a) Group President's conviction (treating a nolo contendere plea as a conviction) of a felony (whether or not any right to appeal has been or may be exercised), (b) willful refusal without proper cause

3

to perform Group President's obligations under this Agreement, (c) fraud, embezzlement or misappropriation or (d) because of Group President's breach of any of the covenants provided for in Section 9. Such termination shall be effected by written notice thereof delivered by the Company to Group President and shall be effective as of the date of such notice; provided, however, that if (i) such termination is because of Group President's willful refusal without proper cause to perform any one or more of Group President's obligations under this Agreement, (ii) such notice is the first such notice of termination for any reason delivered by the Company to Group President under this Section 4.1, and (iii) within thirty (30) days following the date of such notice Group President shall cease Group President's refusal and shall use Group President's best efforts to perform such obligations, the termination shall not be effective. In the event of termination by the Company for cause, without prejudice to any other rights or remedies that the Company may have at law or in equity, the Company shall have no further obligation to Group President other than (i) to pay Base Salary through the effective date of termination, (ii) to pay any Bonus for any year prior to the year in which such termination occurs that has been determined but not yet paid as of the date of such termination, and (iii) with respect to any rights Group President have pursuant to any insurance or other benefit plans or arrangements of the Company.

4.2     **Termination by Group President for Material Breach by the Company and Termination by the Company without Cause**. Unless previously terminated pursuant to any other provision of this Agreement and unless a Disability Period shall be in effect, Group President shall have the right, exercisable by written notice to the Company, to terminate the term of employment effective thirty (30) days after the giving of such notice, if, at the time of the giving of such notice, the Company is in material breach of its obligations under this Agreement; provided, however, that, with the exception of clause (i) below, this Agreement shall not so terminate if such notice is the first such notice of termination delivered by Group President pursuant to this Section 4.2 and within such 15-day period the Company shall have cured all such material breaches. A material breach by the Company shall include, but not be limited to, (i) the Company violating Section 2 with respect to Group President's title, reporting lines, duties or place of employment or (ii) the Company failing to cause any successor to all or substantially all of the business and assets of the Company expressly to assume the obligations of the Company under this Agreement. The Company shall have the right, exercisable by written notice to Group President, to terminate Group President's employment under this Agreement without cause, which notice shall specify the effective date of such termination.

4.2.1   After the effective date of a termination pursuant to this Section 4.2 (a "termination without cause"), Group President shall receive Base Salary and any Bonus earned through the effective date of termination..

4.2.2   After the effective date of a termination without cause, Group President shall remain an employee of the Company for a period ending on the date (the "Term Date") which is the later of (i) the Term Date and (ii) the date which is one years after the effective date of such termination and during such period Group President shall be entitled to receive, whether or not Group President becomes disabled during such period but subject to Section 6, Base Salary at an annual rate equal to Group Presidents Base Salary in effect immediately prior to the notice of termination.  If Group President accepts other full-time employment during such period or notifies the Company in writing of Group President's intention to terminate Group President's status as an employee during such period, Group President shall cease to be an employee of the Company effective upon the commencement of such other employment or the effective date of such termination as specified by Group President in such notice, whichever is applicable.

4.3   **After the Term Date**. If at the Term Date, the term of employment shall not have been previously terminated pursuant to the provisions of this Agreement, no Disability Period is then in effect and the parties shall not have agreed to an extension or renewal of this Agreement or on the terms of a new employment agreement, then Group President shall continue to be employed by the Company as an "at will" employee consistent with the Company's employment policy.

4.4   **Office Facilities**. In the event of a termination without cause, then for the period beginning on the effective date of such termination and ending on the earlier of (a) six (6) months thereafter or (b) the date Group President commences other full-time employment, the Company shall, without charge to Group President, make available to Group President office space at or near Group President's principal job location immediately prior to such termination in order that Group President may find other employment.

4.5   **Release**. A condition precedent to the Company's obligation to make the payments associated with a termination without cause shall be Group President's execution and delivery of a release in the form attached hereto as **Appendix B**. If Group President shall fail to execute and deliver such release, or if Group President revokes such release as provided therein, then in lieu of the payments provided for herein, Group President shall only receive a

severance payment determined in accordance with the Company's policies relating to notice and severance.

4.6    **Retirement**. Notwithstanding the provisions of this Agreement relating to a termination without cause and Disability, on the date Group President first becomes eligible for normal retirement as defined in any applicable retirement plan (or, if none, any applicable qualified employee benefit plan) of the Company or any subsidiary of the Company (the "Retirement Date"), then this Agreement shall terminate automatically on such date and Group President's employment with the Company shall thereafter be governed by the policies generally applicable to employees of the Company, and Group President shall not thereafter be entitled to the payments provided in this Agreement to the extent not received by Group President on or prior to the Retirement Date. In addition, no benefits or payments provided in this Agreement relating to termination without cause and Disability shall include any period after the Retirement Date and if the provision of benefits or calculation of payments provided in this Agreement with respect thereto would include any period subsequent to the Retirement Date, such provision of benefits shall end on the Retirement Date and the calculation of payments shall cover only the period ending on the Retirement Date.

4.7    **Mitigation**. In the event of a termination without cause under this Agreement, Group President shall not be required to seek other employment in order to mitigate Group President's damages hereunder.

4.8    **Payments.** So long as Group President remains on the payroll of the Company or any subsidiary of the Company, payments of Base Salary and Bonus required to be made after a termination without cause shall be made at the same times as similar payments are made to other senior executives of the Company.

5.    **Disability.**

5.1    **Disability Payments**. If during the term of employment and prior to the delivery of any notice of termination without cause, Group President becomes physically or mentally disabled, whether totally or partially, so that Group President is prevented from performing Group President's usual duties for a period of six consecutive months, or for shorter periods aggregating six months in any one twelve-month period, the Company shall, nevertheless, continue to pay Group President's full compensation through the last day of the sixth consecutive month of disability or the date on which the shorter periods of disability shall have equaled a total of six months in any twelve-month period (such last day or date being referred to herein as the "Disability Date"). If Group President has not resumed Group President's

6

usual duties on or prior to the Disability Date, the Company shall pay Group President a pro rata Bonus (if any Bonus is assigned) for the year in which the Disability Date occurs. Thereafter the Company's standard disability insurance benefits will be available to Group President (see Appendix A attached hereto).

5.2    **Recovery from Disability**. If during the Disability Period Group President shall fully recover from Group President's disability, the Company shall restore Group President to full-time service at full compensation and this Agreement shall continue in full force and effect in all respects. In the event Company fails to restore Group President to full-time service then and in that event Section 4.2 of this Agreement shall apply.

5.3    **Other Disability Provisions**. The Company shall be entitled to deduct from all payments to be made to Group President during the Disability Period pursuant to this Section 5 an amount equal to all disability payments received by Group President during the Disability Period from Worker's Compensation, Social Security and disability insurance policies maintained by the Company.

## 6. Death.

6.1    If Group President dies during the term of employment, this Agreement and all obligations of the Company to make any payments hereunder shall terminate except that Group President's estate (or a designated beneficiary) shall be entitled to receive Base Salary to the last day of the month in which Group President's death occurs and Bonus compensation, if any.

## 7. Life Insurance.

7.1    During Group President's employment with the Company, the Company shall provide Group President with standard Life Insurance benefits available to all employees. Group President may purchase additional life insurance benefits at Group President's own cost as provided by the plan.

## 8. Other Benefits.

8.1    **General Availability.** To the extent that (a) Group President is eligible under the general provisions thereof (including without limitation, any plan provision providing for participation to be limited to persons who were employees of the company or certain of its subsidiaries prior to a specific point in time) and (b) the Company maintains such plan or program for the benefit of its employees, during the term of employment and so long as Group President is an employee of the Company, Group President shall be eligible to participate in any benefits offered to

7

all other employees, which may include savings or similar plan or program and in any group life insurance (to the extent set forth in Section 7), hospitalization, medical, dental, accident, disability or similar plan or program of the Company now existing or established hereafter.

8.2    **Benefits After a Termination or Disability.** During the period Group President remains on the payroll of the Company after a termination without cause or during the Disability Period, Group President shall continue to be eligible to participate in the benefit plans and to receive the benefits required to be provided to Group President under this Agreement to the extent such benefits are maintained in effect by the Company for its executives.

8.3    **Location of Mahopac Office; Relocation to New Jersey Office Not Required Administrative Support Equipment and Staff.** Company shall provide Group President with an office, not to be located at the Group President's Residence, except for such period of time reasonably required until Group President and/or Company enter into a lease for office space, to be located in the vicinity of Mahopac, New York. Expenses to establish said Mahopac office shall be borne entirely by Company. The terms of a Lease for the office space must be approved by the Chief Executive Officer in advance. Any legal fees incurred in connection with locating office space and reviewing and negotiating any lease relating to said office space shall be at the sole cost and expense of the Company. Company shall further provide Group President with a part time administrative assistant at an hourly rate of $15 to $20 per hour. Group President shall not be required to travel to Company's Corporate Headquarters located in New Jersey on a daily basis, however, Group President does hereby agree to work at the New Jersey office and visit customer sites approximately one week per month and Company hereby agrees that it shall reimburse Group President for all authorized and pre-approved expenses, provided said expenses are authorized and allowed in accordance with the Internal Revenue Code and Joint Travel Regulation, related to traveling to the New Jersey office or other customer sites. Company agrees to provide, at Company's expense, Group President with all of, but not limited to, the following equipment: laptops, desktop computers, office furniture, cellular phones, PDA devices and any other equipment so as to facilitate continuous and uninterrupted communication with the Company and Company's intranet and server database and for purposes of establishing a Mahopac office for Group President.

8.4    **Medical and Vacation Benefits.** Company shall provide, and Group President shall be entitled to receive, employee benefits provided by Company to all other employees in accordance with the Company's Employee Handbook and Policy Manual as summarized in Appendix A.

**9. Protection of Confidential Information; Non-Compete.**

9.1     **Confidentiality Covenant.** Group President acknowledges that Group President's employment by the Company (which, for purposes of this Section 9 shall mean DSCI and its affiliates) will, throughout the term of employment, bring Group President into close contact with many confidential affairs of the Company, including information about costs, profits, markets, sales, products, key personnel, pricing policies, operational methods, technical processes and other business affairs and methods and other information not readily available to the public, and plans for future development. Group President further acknowledges that the services to be performed under this Agreement are of a special, unique, unusual, extraordinary and intellectual character. Group President further acknowledges that the business of the Company is international in scope, that its products and services are marketed throughout the world, that the Company competes in nearly all of its business activities with other entities that are or could be located in nearly any part of the world and that the nature of Group President's services, position and expertise are such that Group President is capable of competing with the Company from nearly any location in the world. In recognition of the foregoing, Group President covenants and agrees that:

9.1.1     Group President shall keep secret all confidential matters of the Company and shall not disclose such matters to anyone outside of the Company, or to anyone inside the Company who does not have a need to know or use such information, and shall not use such information for personal benefit or the benefit of a third party, either during or after the term of employment, except with the Company's written consent, provided that (i) Group President shall have no such obligation to the extent such matters are or become publicly known other than as a result of Group President's breach of Group President's obligations hereunder and (ii) Group President may, after giving prior notice to the Company to the extent practicable under the circumstances, disclose such matters to the extent required by applicable laws or governmental regulations or judicial or regulatory process;

9.1.2     Group President shall deliver promptly to the Company on termination of Group President's employment, or at any other time the Company may so request, all memoranda, notes, records, reports and other documents (and all copies thereof) relating to the Company's business, which Group President obtained while employed by, or otherwise serving or acting on behalf of, the Company and which Group President may then possess or have under Group President's control; and

9.1.3     If the term of employment is terminated pursuant to Section 4, for a period of time consistent with Company's employment agreement, after such termination, without the prior written consent of the Company, Group President shall not employ, and shall not cause any entity of which Group President is an affiliate to employ, any person who was an employee of the

9

Company at the date of such termination. Prohibition shall not apply to Group President's secretary or executive assistant.

9.2   **Non-Compete.** During the term of employment and through the later of (i) the Term Date, (ii) the date Group President leaves the payroll of the Company, and (iii) for a period of time consistent with Company's employment agreement, after the effective date of any termination of the term of employment pursuant to Section 4, Group President shall not, directly or indirectly, without the prior written consent of the Chief Executive Officer, render any services to, or act in any capacity for, any Competitive Entity, or acquire any interest of any type in any Competitive Entity; provided, however, that the foregoing shall not be deemed to prohibit Group President from acquiring, (a) solely as an investment and through market purchases, securities of any Competitive Entity which are registered under Section 12(b) or 12(g) of the Securities Exchange Act of 1934 and which are publicly traded, so long as Group President is not part of any control group of such Competitive Entity and such securities, including converted securities, do not constitute more than one percent (1%) of the outstanding voting power of that entity and (b) securities of any Competitive Entity that are not publicly traded, so long as Group President is not part of any control group of such Competitive Entity and such securities, including converted securities, do not constitute more than three percent (3%) of the outstanding voting power of that entity. For purposes of the foregoing, the following shall be deemed to be a Competitive Entity: (x) during the period that Group President is actively employed with the Company, any person or entity that engages in any line of business that is substantially the same as either (i) any line of business which the Company engages in, conducts or, to Group President's knowledge, has definitive plans to engage in or conduct or (ii) any operating business that is engaged in or conducted by the Company as to which, to Group President's knowledge, the Company covenants, in writing, not to compete with in connection with the disposition of such business, and (y) during the period following a termination of Group President's term of employment pursuant to Section 4.

## 10. Ownership of Work Product.

10.1   Group President acknowledges that during the term of employment, Group President may conceive of, discover, invent or create inventions, improvements, new contributions, literary property, material, ideas and discoveries, whether patentable or copyrightable or not (all of the foregoing being collectively referred to herein as "Work Product"), and that various business opportunities shall be presented to Group President by reason of Group President's employment by the Company. Group President acknowledges that all of the foregoing shall be owned by and belong exclusively to the Company and that Group President shall have no personal interest therein, unless otherwise agreed to by the parties hereto, provided that they are either related in any manner to the business (commercial or experimental) of the

Company, or are, in the case of Work Product, conceived or made on the Company's time or with the use of the Company's facilities or materials, or, in the case of business opportunities, are presented to Group President for the possible interest or participation of the Company. Group President shall (i) promptly disclose any such Work Product and business opportunities to the Company; (ii) assign to the Company, upon request and without additional compensation, the entire rights to such Work Product and business opportunities; (iii) sign all papers necessary to carry out the foregoing; and (iv) give testimony in support of Group President's inventorship or creation in any appropriate case. Group President agrees that Group President will not assert any rights to any Work Product or business opportunity as having been made or acquired by Group President prior to the date of this Agreement except for Work Product or business opportunities, if any, disclosed to and acknowledged by the Company in writing prior to the date hereof.

## 11. Notices.

11.1    All notices, requests, consents and other communications required or permitted to be given under this Agreement shall be effective only if given in writing and shall be deemed to have been duly given if delivered personally or sent by a nationally recognized overnight delivery service, or mailed first-class, postage prepaid, by registered or certified mail, as follows (or to such other or additional address as either party shall designate by notice in writing to the other in accordance herewith):

If to the Company:

     D & S Consultants, Inc. (DSCI)
     P.O. Box 7259
     Freehold, New Jersey  07727-7259
     Attn:  Steven DeChiaro, Chief Executive Officer

And to Attorney for Company:

     Wilentz, Goldman & Spitzer
     90 Woddbridge Center Drive, Suite 900 Box 10
     Woddbridge, New Jersey  07095
     Attn:  Donald Taylor, Esq.

If to Group President:

     Thomas DeChiaro
     10 Gilead Road
     Mahopac, New York 10541

And to Attorney for Group President:

Edward I. Sumber, P.C.
18 Fair Street
Carmel, New York 10512
Attn:  John Dolgetta, Esq.

## 12. Agreements and Certifications.

12.1    Group President will be required to execute all employee agreements and certifications required of all other employees.

## 13. General.

13.1    **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the substantive laws of the State of New Jersey applicable to agreements made and to be performed entirely in New Jersey.

13.2    **Captions.** The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

13.3    **Entire Agreement.** This Agreement, including Appendix A, sets forth the entire agreement and understanding of the parties relating to the subject matter of this Agreement and supersedes all prior agreements, arrangements and understandings, written or oral, between the parties.

13.4    **No Other Representations.** No representation, promise or inducement has been made by either party that is not embodied in this Agreement, and neither party shall be bound by or be liable for any alleged representation, promise or inducement not so set forth.

13.5    **Assignability.** This Agreement and Group President's rights and obligations hereunder may not be assigned by Group President and except as specifically contemplated in this Agreement, neither Group President, Group President's legal representative nor any beneficiary designated by Executive shall have any right, without the prior written consent of the Company, to assign, transfer, pledge, hypothecate, anticipate or commute to any person or entity any payment due in the future pursuant to any provision of this Agreement, and any attempt to do so shall be void and shall not be recognized by the Company. The Company shall assign its rights together with its obligations hereunder in connection with any sale, transfer or other disposition of all or substantially all of the Company's business and assets, whether by merger, purchase of stock or assets or otherwise, as the case may be. Upon any such assignment, the Company shall cause any such successor expressly to assume such obligations, and such rights and obligations shall inure to and be binding upon any such successor.

13.6    **Amendments; Waivers.** This Agreement may be amended, modified, superseded, cancelled, renewed or extended and the terms or covenants hereof may be waived only by written instrument executed by both of the parties hereto, or in the case of a waiver, by the party waiving compliance. The failure of either party at any time or times to require performance of any provision hereof shall in no manner affect such party's right at a later time to enforce the same. No waiver by either party of the breach of any term or covenant contained in this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this Agreement.

13.7    **Specific Remedy.** In addition to such other rights and remedies as the Company or Group President may have at equity or in law with respect to any breach of this Agreement, if Group President commits a material breach of any of the provisions of Sections 9.1, 9.2, or 10, the Company shall have the right and remedy to have such provisions specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Company.

13.8    **Resolution of Disputes.** Except as provided in the preceding Section 13.7, any dispute or controversy arising with respect to this Agreement and Group President's employment hereunder (whether based on contract or tort or upon any federal, state or local statute, including but not limited to claims asserted under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, as amended, any state Fair Employment Practices Act and/or the Americans with Disability Act) shall, at the election of either Group President or the Company, be submitted to JAMS/ENDISPUTE, or similar entity for resolution in arbitration in accordance with the rules and procedures of JAMS/ENDISPUTE, or similar entity. Either party shall make such election by delivering written notice thereof to the other party at any time (but not later than forty-five (45) days after such party receives notice of the commencement of any administrative or regulatory proceeding or the filing of any lawsuit relating to any such dispute or controversy) and thereupon any such dispute or controversy shall be resolved only in accordance with the provisions of this Section 13.8. Any such proceedings shall take place in New Jersey before a panel of no less than three (3) arbitrators, pursuant to any streamlined or expedited arbitration process, before a non-judicial or a judicial arbitrator, and in accordance with an arbitration process which, in the judgment of such arbitrator, shall have the effect of reasonably limiting or reducing the cost of such arbitration. The resolution of any such dispute or controversy by the arbitrators appointed in accordance with the procedures of JAMS/ENDISPUTE, or similar entity shall be final and binding.  Judgment upon the award rendered by such arbitrator may be entered in any court having jurisdiction thereof, and the parties consent to the jurisdiction of the New Jersey courts for this purpose. The prevailing

party shall be entitled to recover the costs of arbitration (including reasonable attorneys fees and the fees of experts) from the losing party. If at the time any dispute or controversy arises with respect to this Agreement, JAMS/ENDISPUTE, or similar entity is not in business or is no longer providing arbitration services, then the American Arbitration Association shall be substituted for JAMS/ENDISPUTE, or similar entity for the purposes of the foregoing provisions of this Section 13.8. If Group President is the prevailing party in such arbitration, the Company shall promptly pay, upon Group President's demand, all legal fees, court costs and other costs and expenses incurred by Group President in any legal action seeking to enforce the award in any court.

13.9     **Beneficiaries.** Whenever this Agreement provides for any payment to Group President's estate, such payment may be made instead to such beneficiary or beneficiaries as Group President may designate by written notice to the Company. Group President shall have the right to revoke any such designation and to redesignate a beneficiary or beneficiaries by written notice to the Company (and to any applicable insurance company) to such effect.

13.10   **No Conflict.** Group President represents and warrants to the Company that this Agreement is legal, valid and binding upon Group President and the execution of this Agreement and the performance of Group President's obligations hereunder does not and will not constitute a breach of, or conflict with the terms or provisions of, any agreement or understanding to which Group President is a party. The Company represents and warrants to Group President that this Agreement is legal, valid and binding upon the Company and the execution of this Agreement and the performance of the Company's obligations hereunder does not and will not constitute a breach of, or conflict with the terms or provisions of, any agreement or understanding to which the Company is a party.

13.11   **Withholding Taxes.** Payments made to Group President pursuant to this Agreement shall be subject to withholding and social security taxes and other ordinary and customary payroll deductions.

13.12   **Offset.** Neither Group President nor the Company shall have any right to offset any amounts owed (with the exception of Capital Equipment in the acknowledged possession of the Group President to include, but not limited to, the following equipment: laptops, desktop computers, office furniture, cellular phones, PDA devices and any other equipment) by one party hereunder against amounts owed or claimed to be owed to such party, whether pursuant to this Agreement or otherwise, and Group President and the Company shall make all the payments provided for in this Agreement in a timely manner. Upon termination of employment of the Group President for any reason, the Company may withhold the cost of Capital Equipment in the acknowledged possession of the Group President until; all items are returned to and acknowledged by the Company.

13.13  **Severability.** If any provision of this Agreement shall be held invalid, the remainder of this Agreement shall not be affected thereby; provided, however, that the parties shall negotiate in good faith with respect to equitable modification of the provision or application thereof held to be invalid. To the extent that it may effectively do so under applicable law, each party hereby waives any provision of law which renders any provision of this Agreement invalid, illegal or unenforceable in any respect.

13.14  **Survival.** Sections 3.4 and 9 through 11 shall survive any termination of the term of employment by the Company for cause pursuant to Section 4.1. Sections 3.4, 4.4, 4.5, 4.7 and 8 through 11 shall survive any termination of the term of employment pursuant to Sections 4.2, 5 or 6.

13.15  Omitted.

13.16  Omitted.

13.17  **Liability Insurance.**  Company shall provide Group President insurance covereage protection to the same extent, if any, as the Company covers its other officers and directors.

13.18  **Indemnification.**  The Company hereby covenants and agrees to indemnify Group President and hold him harmless to the fullest extent permitted by law and under the By-laws of the Company against and in respect to any and all actions, suits, proceedings, claims, demands, judgments, costs, expenses (including attorney's fees), losses, and damages resulting from Group President's good faith performance of his duties and obligations with the Company. This provision shall survive the termination of this Agreement.

[Signature Page Follows.]

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the date first above written.

COMPANY:

D&S CONSULTING, INC.

By: _____

Name: _____Steven DeChiaro_____

Title: _____Chief Executive Officer_____

EMPLOYEE/EXECUTIVE:

THOMAS DeCHIARO

By: _____

Name: _____Thomas DeChiaro_____

WITNESS

Marshall C. Phelps Jr.

By: _____

Name: Marshall C. Phelps Jr.

Richard T. Gerstner

By: _____

Richard T. Gerstner

F:\WPDOCS\WPDOCS\D\DECH8040\EMPLOYMENT AGREEMENT DRAFT 06OCT05doc_cleanV2.doc

fINAL VERSION 10-08-05

# APPENDIX A

## Company Benefits Summary

<u>Full Time Employees</u>:

- Benefits 1-16 are available to Full Time Employees
- Shareholder's Meeting may be attended by DSCI shareholders only
- Employees who do not own shares are welcome to attend the Holiday party however DSCI will not incur any travel or hotel expenses.

<u>Regular Part Time Employees</u>:

- Benefits 1 through 7 not available
- Benefits 8 through 13 are available to Regular Part Time Employees
- Benefits 14 through 16 are pro-rated based on regularly scheduled hours

<u>Other Part Time Employees</u>:

- No Benefits available

1)  <u>Health Benefits:</u>    *Blue Cross Blue Shield "Horizon Direct Access" PPO*

- Group Number: 00-82472
- Office Visit Co-Pay:  $30.00
- Emergency Room Co-Pay:  $50.00
- Deductible – Out of Network: $1,000.00
- Coinsurance – Out of Network: 70% paid by BCBS
  (of Reasonable and Customary amount)/ 30% paid by employee
  Customer Service: 1.800.355.2583

2)  <u>Prescription Program:</u>    *Blue Cross Blue Shield "Horizon Direct Access" PPO*

- Group Number: 00-82472
- Generic Prescription Co-Pay:  $10.00
- Brand Prescription Co-Pay:  $20.00
- Preferred Prescription (No generic available) Co-Pay:  $35.00

3)    <u>Dental Plan:</u>        *The Metropolitan Life Insurance Company*

- Group Number: 5567885
- Deductible: $50.00
- Coinsurance – Preventative: 100% paid by MetLife
  (Once every 6 months)
- Coinsurance – Basic: 80% paid by MetLife / 20% paid by employee
- Coinsurance - Major: 50% paid by MetLife/50% paid by employee
- Cost of Dental Plan Paid 100% by DSCI

<u>Orthodontia</u> Included – CHILDREN UP TO AGE 19 ONLY

- Coinsurance – 50%
- Lifetime Maximum - $1,000.00
- <u>Waiting Period</u>: None
- Maximum Yearly Benefit: $1,500.00

Preferred Dentist Directory: 1.800.474.7371
http://www.metlife.com/dental
Customer Service: 1.800.ASK.4.MET (1.800.275.4638)

4)    <u>Vision Plan:</u>        *Blue Cross Blue Shield "Horizon Direct Access" PPO*

- Group Number: 00-82472
- Coverage Includes:
  - Routine vision exam-$30.00 co-pay in network
  - Eye surgery such as keratotomy when the primary purpose is to correct Myopia (nearsightedness), Hyperopia (farsightedness), or Astigmatism (blurring)
  - Vision Hardware -$100.00 every two years
  - Vision Discount Program at Cole Vision and Davis Vision

5)    <u>Long Term Disability Insurance:</u>    *The Metropolitan Life Insurance Company*

- Group Number: 5567885
- Effective ninety (90) days after disability begins
- 75% of earnings, max $10,000.00 per month
- Customer Service: 1.800.ASK.4.MET (1.800.275.4638)
- Cost of Disability Insurance Paid 100% by DSCI
  Group President shall have the option of increasing said coverage and paying any additional premiums above and beyond the amount paid for by the Company in connection with the above initial coverages

fINAL VERSION 10-08-05

6) <u>Short Term Disability Insurance:</u>  *The Metropolitan Life Insurance Company*

- Group Number: 5567885
- Effective one (1) week from the day you become disabled
- 75% of earnings, max $10,000.00 per month
- Maximum duration 26 weeks
- Customer Service: 1.800.ASK.4.MET (1.800.275.4638)
- Cost of Short Term Disability Insurance Paid 100% by DSCI
  Group President shall have the option of increasing said coverage and paying any additional premiums above and beyond the amount paid for by the Company in connection with the above initial coverages

7) <u>Life Insurance:</u>    *The Metropolitan Life Insurance Company*

- Group Number: 5567885
- <u>Basic Group Term Life / Accidental Death & Dismemberment:</u>

  - Life Amount:  $20,000.00; $50,000.00 for Directors
  - Reduction of Benefit by 50% at age 70

- <u>Enhanced Optional Life / AD & D</u> (If elected by employee):

  - Employee:  Life Amount -  $10,000 Increments
  - Plan Maximum: $500,000, not to exceed 5x Salary
  - Spouse/Children:  Life Amount - $5,000 Max/$2,000 Max
    Features:    a) Portability
    b) Met Travel Assistance Program
    Eligibility:  Employee must buy up (for self) in order to participate

    Customer Service: 1.800.ASK.4.MET (1.800.275.4638)
    Cost of Life Insurance Paid 100% by DSCI

8) <u>Credit Cards:</u>    *American Express Corporate Card*

Flight Insurance Plan: $100,000.00 at no cost to employee

*Visa First Bankcard*

Cost of Card/Insurance Paid 100% by DSCI

9) <u>401K Plan:</u>    *Benefit Consultant Group (Money Manager – Oppenheimer Funds)*

- All employees are eligible three months after date of hire.

19

- DSCI will match $.50 on $1.00 with a 6% max.
- Employee will be fully vested after 5 years of service.
  Group President's 401K Plan shall vest as follows: Employees plan shall be thirty-three (33%) vested after the first year of employment, sixty-six (66%) percent vested after the second year of employment and one hundred (100%) percent vested after three years of employment by the Company

10) <u>Employee Stock Purchase Plan:</u>          *Employee Stock Purchase Plan (ESPP)*

- Employee will be fully vested after 5 years of service.

11) <u>Bonus Plan:</u>          *Bonus Plan*

- Additional Compensation (Cash, Stock, etc.) for meritorious service - At the discretion of the Board of Directors

12) <u>Tuition Reimbursement</u>: *Reimbursement for Grades >/= B*

- Requires Corporate Approval
- Reimbursement for course, if approved
- Reimbursement for books, if approved
- Employee Longevity Statement may be required
- Reimbursement Paid 100% by DSCI

13) <u>Personal Computer:</u>    *Company Provided Interest Free Loan*

- Requires Corporate Approval (12 payments maximum)
- Loan repayment via payroll deduction

14) <u>Vacation:</u>          *Four (4) weeks paid vacation – Twenty (20) business days*

- Rollover: four (4) weeks or 160 hours
- One (1) additional day for every two (2) years service

15) <u>Holidays:</u>          *Ten (10) days paid Government holidays*

16) <u>Sick/Personnel:</u>    *One (1) week paid sick or personal time – Five (5) business days*

- Rollover: thirteen (13) weeks
- Additional sick time available (paid) if, approved
- Paid 100% by DSCI

17) <u>Shareholder's Mtg:</u>    *Election of the Board of Directors*

20

- Time/Place/Cost-Sharing - At the discretion of the Board of Directors

FINAL VERSION 10-08-05

## APPENDIX B

### RELEASE

Pursuant to the terms of the Employment Agreement made as of _____, between D&S Consultants, Inc., a New Jersey corporation (the "Company"), 1433 Highway 34 South, Farmingdale, New Jersey 07727 and the undersigned (the "Agreement"), and in consideration of the payments made to me and other benefits to be received by me pursuant thereto, I, _____, being of lawful age, do hereby release and forever discharge the Company and any successors, subsidiaries, affiliates, related entities, predecessors, merged entities and parent entities and their respective officers, directors, shareholders, employees, benefit plan administrators and trustees, agents, attorneys, insurers, representatives, affiliates, successors and assigns from any and all actions, causes of action, claims, or demands for general, special or punitive damages, attorney's fees, expenses, or other compensation or damages (collectively, "Claims"), which in any way relate to or arise out of my employment with the Company or any of its subsidiaries or the termination of such employment, which I may now or hereafter have under any federal, state or local law, regulation or order, including without limitation, Claims related to any stock options held by me or granted to me by the Company that are scheduled to vest subsequent to the Severance Term Date, as defined in the Agreement, and Claims under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Fair Labor Standards Act, the Family and Medical Leave Act and the Employee Retirement Income Security Act, each as amended through and including the date of this Release; provided, however, that the execution of this Release shall not prevent the undersigned from bringing a lawsuit against the Company to enforce its obligations under the Agreement.

I acknowledge that I have been given at least 21 days from the day I received a copy of this Release to sign it and that I have been advised to consult an attorney. I understand that I have the right to revoke my consent to this Release for seven days following my signing. This Release shall not become effective or enforceable until the expiration of the seven-day period following the date it is signed by me.

I ALSO ACKNOWLEDGE THAT BY SIGNING THIS RELEASE I MAY BE GIVING UP VALUABLE LEGAL RIGHTS AND THAT I HAVE BEEN ADVISED TO CONSULT A LAWYER BEFORE SIGNING. I further state that I have read this document and the Agreement referred to herein, that I know the contents of both and that I have executed the same as my own free act.

WITNESS my hand this ____ day of _____, ____.

_____
[Name]

EXHIBIT B

# WILENTZ
# GOLDMAN
# &SPITZER P.A.

## ATTORNEYS AT LAW

90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, NJ 07095-0958
(732) 636-8000
Fax (732) 855-6117

Meridian Center I
Two Industrial Way West
Eatontown, NJ 07724-2265
(732) 542-4500
Fax (732) 493-8387

110 William Street
26th Floor
New York, NY 10038-3901
(212) 267-3091
Fax (212) 267-3828

Two Penn Center Plaza
Suite 910
Philadelphia, PA 19102
(215) 940-4000
Fax (215) 636-3999

Park Building
355 Fifth Avenue
Suite 400
Pittsburgh, PA 15222
(412) 232-0808
Fax (412) 232-0773

*website: www.wilentz.com*

Please reply to:
Woodbridge
**Direct Dial: (732) 855-6434**
**Direct Fax: (732) 726-6520**
E-mail: dtaylor@wilentz.com

February 21, 2008

**VIA FACSIMILE & REGULAR MAIL**
Leonard Benowich, Esq.
Benowich Law, LLP
1025 Weschester Ave.
White Plains, NY 10604

Re:    **DeChiaro v. D&S Consulting, Inc. et al.**
       **08-CIV-1199 (BRIEANT)**

Dear Mr. Benowich:

     This firm represents defendants D&S Consultants, Inc. ("DSCI") and Steven DeChiaro ("Mr. DeChiaro") (collectively "Defendants") with respect to the above-referenced matter. Pursuant to paragraph 13.8 of plaintiff Thomas DeChiaro's ("Plaintiff") employment agreement, Defendants elect to have Plaintiff's dispute, as set forth in Plaintiff's Complaint, submitted to arbitration. Kindly withdraw Plaintiff's Complaint, and advise me after you have done so.

     Thank you for your attention to this matter.

                            Very truly yours,

                            DONALD E. TAYLOR

#2926772

WILENTZ, GOLDMAN & SPITZER
A Professional Corporation
110 William Street
26th Floor
New York, NY 10038-3901
(212) 267-3091
Attorneys for Defendants
  D&S Consultants, Inc., and
  Steven DeChiaro

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------X

Thomas DeChiaro,

   Plaintiff,

vs.

D&S Consultants, Inc., and Steven
DeChiaro,

   Defendants.

-----------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 08 CIV 1199
(BRIEANT)

**ORDER GRANTING
DEFENDANTS'
MOTION TO DISMISS
PLAINTIFF'S
COMPLAINT**

THIS MATTER, having come before the Court on the application of

Wilentz, Goldman & Spitzer, P.A., attorneys for defendants, D&S Consultants,

Inc. and Steven DeChiaro ("Defendants") (Willard C. Shih, Esq, of counsel), for an

Order dismissing plaintiff Thomas DeChiaro's ("Plaintiff") Complaint and

compelling arbitration, and on notice to Plaintiff's counsel, Benowich Law, LLP

(Leonard Benowich, Esq., of counsel), and the Court having considered the

submissions on behalf of the parties and for good cause shown:

IT IS ON THIS _____ day of _____, 2008:

ORDERED that Plaintiff Thomas DeChiaro's Complaint is hereby

dismissed with prejudice;

IT IS FURTHER ORDERED that this matter be and hereby is referred to

binding arbitration.

IT IS FURTHER ORDERED that a copy of this Order shall be served by

Defendants' counsel upon counsel for Plaintiff within ____ days of the entry hereof.


_____

Hon., Charles L. Brieant, U.S.D.J.

WILENTZ, GOLDMAN & SPITZER
A Professional Corporation
110 William Street
26th Floor
New York, NY 10038-3901
(212) 267-3091
Attorneys for Defendants
  D&S Consultants, Inc., and
  Steven DeChiaro

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------X
                    :

Thomas DeChiaro,           :    Civil Action No. 08 CIV 1199

          Plaintiff,   :    (BRIEANT)

vs.                  :

D&S Consultants, Inc., and Steven  :    **CERTIFICATION OF**
DeChiaro,                 :    **SERVICE**

          Defendants.  :

                    :
---------------------------------------------X

      I, WILLARD C. SHIH, ESQ., being of full age and duly sworn upon

my oath,, hereby certify as follows:

    1.    I am an attorney at law of the State of New York and I am a

shareholder of Wilentz, Goldman & Spitzer P.A., attorneys for the defendants

D&S Consultants, Inc. ("DSCI") and Steven DeChiaro ("Mr. DeChiaro")

(collectively, "Defendants") in the captioned matter.

      2.    On February 26, 2008, I caused to be served on Leonard Benowich,

Esq., Benowich Law, LLP, 1025 Westchester Avenue, White Plains, New York

1060, Attorneys for Plaintiff, via the Court's ECF System, and via UPS Overnight

Mail, the following documents in support of Defendants' Motion to Dismiss:

      a.    Notice of Motion to Dismiss;

      b.    Memorandum in Support of Motion to Dismiss;

      c:    Certification of Willard C. Shih;

      d.    Certification of Service; and

      e.    Proposed Order of Dismissal.

      3.    Pursuant to 28 U.S.C. § 1746, I hereby certify that the foregoing

statements made by me are true.  I am aware that if any of the foregoing

statements made by me are willfully false, I may be subject to punishment.



                           WILLARD C. SHIH

Dated: February 26, 2008